UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------ x
JEROME FORD,

                Plaintiff,

        - against -

L.T. SPEARS, P.A. NUNEZ, P.A. ROSA, FOOD
ADMIN MR. KIMO, DR. BORECKY, MR.
TUNATI, and UNITED STATES,

                Defendants.
------------------------------------------------------ x

**MEMORANDUM & ORDER**

10 CV 1314 (RJD) (LB)

DEARIE, District Judge.

       Pro se plaintiff, Jerome Ford, an inmate housed in the Metropolitan Detention Center

("MDC") in Brooklyn, New York, sues an assortment of federal government employees and the

United States based on injuries plaintiff claims he sustained when he inadvertently ingested glass

with his food during mealtime. Defendants move to dismiss for lack of subject matter

jurisdiction under Federal Rule of Civil Procedure 12(b)(1). In the alternative, defendants move

either for dismissal for failure to state a claim under Rule 12(b)(6) or for summary judgment

under Rule 56. Although defendants' motions to dismiss for failure to exhaust are denied,

plaintiff's claims are nonetheless dismissed in their entirety as to all defendants.

## I. BACKGROUND

       The Court has liberally construed the disjointed record, including plaintiff's complaint

and opposition memorandum, defendants' Rule 56.1 statement, and the evidence submitted by

both parties. The essential facts are undisputed, except where indicated.[1]

---

[1] Although plaintiff was provided with the requisite "Notice to Pro Se Litigant Opposing a Rule 12 Motion
Supported by Matters outside the Pleadings and Motion for Summary Judgment" pursuant to Local Civil Rule 56.2,
see ECF Docket #54, plaintiff's Memorandum in Opposition ("Opp. Mem.") did not in any way conform to Federal
Rule of Civil Procedure 56, and plaintiff submitted no Local Rule 56.1 statement. See ECF Docket # 51. Plaintiff,

A. Alleged Consumption of Glass

On July 13, 2009, plaintiff was being held in the Special Housing Unit ("SHU") at the MDC. Defs.' Ex. B., Ford's Deposition ("Ford Dep.") at 60, 68. After beginning to eat his evening meal, plaintiff claims that he discovered pieces of glass in his food, some of which he ingested and then spit out along with "[b]lood and rice" into the toilet. Id. at 65-66.

Plaintiff alerted Duty Officer, Anthony Tonani ("Tonani"), who examined plaintiff's food and "saw what appeared to be shards of clear, broken glass . . . approximately six pieces and . . . no more than a couple of millimeters in size." Defs.' Ex. H., Tonani's Responses to Written Deposition Questions ("Tonani Resp.") at 3. Tonani "was alarmed" and "forwarded [plaintiff's] complaint and [his] tray to the officer-in-charge," id. at 2, 4, who in turn alerted the Food Administrator, Kimo Elraheb ("Elraheb"), Defs.' Ex. F., Kimo Elraheb's Responses to Written Deposition Questions at 3.

Following a "visual inspection of the food tray," including moving the "food around in the tray with a pen," Elraheb "determined that there was indeed some foreign object," in the food that "appeared to be glass." Id. at 3, 8. Elraheb was "surprised that glass could end up in an inmate's meal because no glass is kept in the food services area" at MDC. Id. at 8. Elraheb "had never received or heard about a complaint of glass in an inmate's food," but on that same night, plaintiff's cellmate also made the same complaint. Id. at 7-9. Elraheb "offered a replacement tray for [plaintiff]." Id. at 3.

B. Initial Medical Attention

Tonani also contacted Physician Assistant ("PA"), Freddy Nunez ("Nunez"), "to provide medical assistance." Tonani Resp. at 2. Within "20 or 30 minutes," Nunez arrived and spoke to

---

therefore, did not specifically respond or controvert any of the "undisputed facts" presented in defendants' Rule 56.1 statement ("Def. R. 56.1").

2

plaintiff. Ford Dep. at 68. The parties dispute Nunez's reaction. Plaintiff claims that Nunez, peering through the window of plaintiff's cell, looked in plaintiff's mouth and told him to spit into the toilet. Id. at 76-77. Plaintiff claims that Nunez saw "the blood that was in the toilet" and told plaintiff that "there's no one here than can treat that so" plaintiff would have to wait until the morning for medical treatment. Id. Nunez, on the other hand, testified that he examined plaintiff in the SHU's examination room and did not see any injuries consistent with glass consumption. Defs.' Ex. C., Freddy Nunez's Responses to Written Deposition Questions at 3-4. Nunez claims that he decided plaintiff did not need any "additional medical treatment" and denies that he would ever "have told a patient that he would have to wait overnight for medical care that was immediately necessary." Id. at 3, 7.

The next morning, July 14, 2009, plaintiff complained to another PA, Soraya Rosa ("Rosa"). Rosa Resp. at 2. Rosa looked into plaintiff's mouth using a flashlight and "did not see any bleeding or lacerations." Id. at 4. Although she did not consider it an "emergency situation," Rosa arranged to have plaintiff "transported to Health Services for further examination by a physician." Id. at 3; Opp. Mem. at 10-11.

Although plaintiff claims that "Lt Spears denied [him] medical attention," Compl. at 6, the parties agree that plaintiff was, in fact, taken to see BOP medical officer, Dr. Michael Borecky ("Dr. Borecky") on July 15, 2009. See Ex. D. to McFarland Decl., Ford Medical Records at 18.

Plaintiff complained to Dr. Borecky of "sharp" "[a]bdominal pain" reaching a 7 on a 1-10 pain scale. Id. Dr. Borecky noted initially that plaintiff was "able to pass gas but ha[d]n't passed any stool" and "ha[d] eaten since [the incident] with no problems." Id. Dr. Borecky then conducted a full physical examination, including plaintiff's pulmonary, cardiovascular,

3

abdominal, and gastrointestinal systems, which indicated that everything was "normal" and that "there was no evidence of bleeding." Id. at 20. Nonetheless, in response to plaintiff's complaints of pain, Borecky prescribed Omeprezole for acid reflux and Acetaminophen for pain and ordered an X-ray. Id., Plaintiffs X-ray came back negative "except for small right pleural effusion [fluid in his lung cavity] and mild destroscoliosis of lumber spine." Id. at 21. Plaintiff does not claim that either of these abnormalities could have been caused by ingesting glass.

C. Subsequent Medical Attention

Over the next nine months, plaintiff saw no less than seven health care professionals, including Dr. Borecky, a total of ten times. See id. at 1-68. On only two of these occasions— November 17, 2009 and March 31, 2010—did plaintiff complain of any abdominal or gastrointestinal abnormalities.

On November 17, 2009 plaintiff renewed his complaint of abdominal pain for the first time since Dr. Borecky's initial examination, but the health care provider diagnosed indigestion. Id. at 30-32. On March 31, 2010, plaintiff returned to Dr. Borecky, complaining of "bleeding from his Rectum 3 times a week." Plaintiff also told Dr. Borecky, however, that he was not experiencing any cramps or stomach pain. Id. at 44. Dr. Borecky again performed a full physical exam, diagnosing plaintiff with "External Hemorrhoids." Id. at 44-45. Dr. Borecky found no evidence of rectal bleeding. Id. Dr. Borecky renewed plaintiff's acid reflux prescription and ordered a second abdominal X-ray, id. at 46, which again came back negative "except for . . . mild scoliosis of the lower lumber spine." Id. at 48. Plaintiff does not claim, nor does any evidence indicate, that his external hemorrhoids were caused by eating glass nearly nine months earlier.

4

D. Administrative Exhaustion

The parties dispute plaintiff's compliance with some of the following exhaustion requirements.

Plaintiff claims that he submitted an informal resolution request using form "BP-8" on July 14, 2009, the day after he claims he ingested glass. Opp. Mem. at 19. Defendants flatly reject ever receiving such a form. Defs.' Reply at 5.

According to plaintiff, he waited for a response to his BP-8 submission and receiving none, he proceeded with formal requests on July 30, 2009, submitting two "BP-9" forms. Pl.'s Ex. B, C. On one BP-9 form, plaintiff complained that he "ate glass [accidentally] an[d] [wasn't] granted immediate attenti[on] due to staff's animosity." Pl.'s Ex. B. On the other BP-9 form, plaintiff alleged that he was "denied medical attenti[on]." Pl.'s Ex. C. The Administrative Remedy Coordinator ("Coordinator") rejected both claims on July 31, 2009, stating that plaintiff "did not attempt informal resolution prior to submission of [his] administrative remedy, or . . . did not provide the necessary evidence of [his] attempt at informal resolution." Pl.'s Ex. D. The Coordinator noted, however, that "because of the seriousness of these allegations this complaint has been forwarded for review & investigation." Id. The Coordinator also advised that plaintiff could "resubmit [his] request in proper form within 5 days of the date of [the] rejection notice." Id.

On August 4, 2009, plaintiff resubmitted his two BP-9 forms along with another BP-8[2] form based on a counselor's advice. This counselor informed plaintiff that "they could not find" plaintiff's previous BP-8 form. Opp. Mem. at 19; Pl.'s Ex. E. The Administrative Remedy Coordinator rejected both of plaintiff's grievances that same day, stating again that plaintiff "did

---

[2] Plaintiff included a copy of this second BP-8 form with his Opposition Memorandum, but no copy of his initial BP-8.

not attempt informal resolution prior to submission . . . or . . . did not provide the necessary evidence of [his] attempt at informal resolution." Pl.'s Ex. F. The Coordinator again noted that plaintiff could "resubmit [his] request in proper form within 5 days of the date of this rejection notice." Id.

The following day, BOP officials transferred plaintiff from the MDC to United States Penitentiary ("USP") Canaan in Pennsylvania and according to plaintiff, Marshall Services confiscated all of his personal property, including his legal documents. Opp. Mem. at 19. Plaintiff remained at USP Canaan until his transfer to Federal Correctional Institution ("FCI") McKean in Pennsylvania on August 21, 2009. Id. Plaintiff claims that four days after his arrival at FCI McKean, BOP officials returned all but his legal documents. Id. From August 21 through September 4, 2009, plaintiff claims that he spoke to prison officials every day "about his missing legal documents . . . that he needed to continue his process on the denial of his medical claim," without success. Id. at 20. Plaintiff finally received his legal documents only after speaking to the Warden on September 5, 2009. Id.

On September 15, 2009, plaintiff submitted a typed and amended BP-9 form, which contained additional information, including descriptions of his unresponded-to attempts at informal resolution and an attached timeline of events[3] from his alleged injury to the present. Pl.'s Ex. H. The amended BP-9 stated that, as of the time of writing, plaintiff had not received any response to his BP-8 forms (submitted on July 14, 2009 and August 4, 2009) and complained that "[w]hile I continued filing my remedies the response was always the same[:] I filed in an untimely fashion." Id. at 1-3. Plaintiff's attachment also explained the difficulty plaintiff had in

---

[3] It is unclear both when plaintiff wrote this "attached timeline" and which version of it he attached to his September 15, 2009 BP-9 form. Plaintiff also included the same text, verbatim, in the complaint submitted to this Court in March 2010. See Compl. at 4, 6; Id. Att. 2 at 1.

retrieving his legal documentation as he was transferred among facilities. The Coordinator again rejected plaintiff's BP-9 as untimely. Pl.'s Ex. I.

On October 19, 2009, plaintiff appealed this latest rejection to the Regional Director of BOP by filing form "BP-10." Pl.'s Ex. J. On October 21, 2009, the Regional Director rejected plaintiff's appeal as untimely. Pl.'s Ex. K. On October 29, 2009, plaintiff next appealed the Regional Director's rejection, using form "BP-11," to the Central Office. Pl.'s Ex. L. The Central Office rejected plaintiff's appeal on January 15, 2010 as untimely. Pl.'s Ex. M. The submission of the BP-11 served as the final administrative remedy available to plaintiff. See 28 C.F.R. § 542.15(a).

E. Procedural History

Plaintiff filed the instant complaint in the Eastern District of New York on March 19, 2010. On August 30, 2010, plaintiff separately submitted a Federal Torts Claim Act ("FTCA") claim to the BOP Regional Office. Defs.' Ex. E. The Regional Office rejected plaintiff's FTCA claim on September 29, 2010 "because [his] claim contain[ed] allegations of constitutional violations, which are not actionable under the [FTCA]." Id. at 8. On January 20, 2012, defendants filed their motions to dismiss plaintiff's federal civil complaint, requesting, alternatively, summary judgment. Plaintiff opposed, filing an opposition memorandum and exhibits on February 28, 2012. ECF Docket # 51, 53.

## II. DISCUSSION

A. Subject Matter Jurisdiction and Exhaustion of Administrative Remedies

Defendants move to dismiss plaintiff's complaint under Rule 12(b)(1) on sovereign immunity and exhaustion grounds.

7

"After [c]onstruing all ambiguities and drawing all inferences in a plaintiff's favor, a district court may properly dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) if it lacks the statutory or constitutional power to adjudicate it." Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005) (internal citations and quotation marks omitted) (modification in original). As with Rule 12(b)(6) motions, the court holds pro se litigants "to less stringent standards." See Erickson v. Pardus, 551 U.S. 89, 94 (2007). When reviewing a motion under Rule 12(b)(1), the Court may refer to evidence outside the pleadings. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).

### 1. Sovereign Immunity and Exceptions

It is axiomatic that the United States is immune from suit in state and federal court "save as [the United States] consents to be sued." United States v. Mitchell, 445 U.S. 535, 538 (1980) (holding that consent to suit must be "unequivocally expressed" by Congress) (internal quotations omitted). The United States "has not waived the government's sovereign immunity . . . from lawsuits based on constitutional claims." King v. Simpson, 189 F.3d 284, 287 (2d Cir. 1999) (citing FDIC v. Meyer, 510 U.S. 471, 477–78 (1994)). Accordingly, all potential constitutional claims brought against the United States must be dismissed for lack of subject matter jurisdiction. Similarly, because "an official-capacity suit is . . . treated as a suit against the entity," Kentucky v. Graham, 473 U.S. 159, 166 (1985), plaintiff's constitutional claims against the individual defendants in their official capacities must also be dismissed, Castro v. United States, 34 F.3d 106, 110 (2d Cir. 1994) (no waiver of sovereign immunity for federal employees' constitutional torts).

Plaintiff may raise state tort claims against the United States under the FTCA, however, which includes a limited waiver of sovereign immunity for money damages arising from state

law torts committed by federal employees "acting within the scope of [their] employment." See 28 U.S.C. § 1346(b)(1). The waiver does not extend to state tort suits against federal employees in either their official or individual capacities. 28 U.S.C. § 2679(b)(1). The Court, therefore dismisses all of plaintiff's state tort claims against federal employees in either their official or individual capacities, substituting the United States in their stead. See Nwaokocha v. Sadowski, 369 F. Supp. 2d 362, 371 (E.D.N.Y. 2005) (Weinstein, J.) ("Following [sua sponte] certification [that federal employees were acting within the scope of their employment], the court may substitute the United States as the defendant in an FTCA claim so that the case may proceed.").[4]

Plaintiff may assert certain *constitutional* claims, including, as here, those arising under the Eighth Amendment, against the federal employees in their *individual* capacities under Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 396-97 (1971). Bivens liability, however, does not extend to Nunez, who enjoys absolute immunity under the Public Health Services Act for claims "resulting from the performance of medical . . . or related functions." 42 U.S.C. § 233(a); see Cuoco v. Mortisugu, 222 F.3d 99, 108 (2d Cir. 2000) (barring Bivens action against Public Health Service's employee under Section 233(a)); Brown v. McElroy, 160 F. Supp. 2d 699, 703 (S.D.N.Y. 2001) (Marrero, J.) (applying Section 233(a) immunity to claimed *denials* of medical treatment).[5]

---

[4] It does not appear that there was any "certification by the Attorney General that the defendant employee[s] w[ere] acting within the scope of his office or employment at the time of the incident out of which the claim arose." See 28 U.S.C § 2679 (d)(1) ("Upon [such] certification . . . any civil action or proceeding commenced . . . in a United States district court shall be deemed an action against the United States . . . and the United States shall be substituted as the party defendant."). The FTCA, however, "permits the court to certify" that a federal employee was acting within the scope of his employment "in the absence of a certification by the Attorney General." B & A Marine Co. v. Am. Foreign Shipping Co., 23 F.3d 709, 715 (2d Cir. 1994); see Nwaokocha, 369 F. Supp. 2d at 371 (reading B & A Marine Co. to allow sua sponte certification under the FTCA); but see B & A Marine Co., at 717 (Glasser, J., concurring) ("Insofar as [the majority] suggests that the statute authorizes the court to certify sua sponte, I find nothing in [the statute] that supports it.").

[5] Although Rosa is a physician's assistant, she is not absolutely immune under Section 233(a) because she is employed by the BOP.

Plaintiff's only remaining claims are his Eighth Amendment claims against the federal employees—save for Nunez—in their individual capacities (under Bivens) and his state law tort claims for medical malpractice and negligence against the United States (under the FTCA). Before reaching the merits, the Court must first determine whether plaintiff properly exhausted his required administrative remedies.

2. Prisoner Litigation Reform Act ("PLRA") Exhaustion – Bivens Claims

The PLRA bars prisoners from bringing a federal claim "with respect to prison conditions . . . until such administrative remedies as are available are exhausted," 42 U.S.C. § 1997e(a). The PLRA applies to "*all* inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir. 2009) (internal quotations omitted) (emphasis added). "Bivens actions . . . [against] BOP employees in their individual capacity, are subject to the PLRA." Valentine v. Lindsay, No. 10-CV-868 (JG)(JMA), 2011 WL 3648261, at *5 (E.D.N.Y. Aug. 17, 2011) (Gleeson, J.). When suing under Bivens, therefore, federal prisoners "must first exhaust inmate grievance procedures" before bringing an action in federal court. Porter v. Nussle, 534 U.S. 516, 524 (2002).

The BOP has a three-tiered administrative remedy system to "allow[] an inmate to seek formal review of an issue relating to any aspect of his/her own confinement." Macias v. Zenk, 495 F.3d 37, 42 (2d Cir. 2007) (quoting 28 C.F.R. § 542.10(a)); see Wade v. Fischer, No. 10 CV 5417, 2012 WL 1118206, at *2 (E.D.N.Y. Mar. 30, 2012) ("The contours of 'proper exhaustion' necessarily depend upon the particular grievance system that applies."). First, "the inmate [must] report informally the issue to the staff." Macias, 495 F.3d at 42. Second, the inmate must "file a written remedy request with the Warden" through a BP-9 form within 20 calendar days of the

incident that gave rise to the claim. Id.; see 28 C.F.R. § 542.14(a). Finally, "the inmate [must] file appeals with the appropriate Regional Director" on a BP-10 form within 20 calendar days of the Warden's response "and then with the General Counsel" on a BP-11 form within 30 calendar days of the Regional Director's response. Macias, 495 F.3d at 42; see 28 C.F.R. § 542.15(a).

Exhaustion "means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." Woodford v. Ngo, 548 U.S. 81, 90 (2006) (internal quotations omitted) (emphasis in original). The fact that a plaintiff may have submitted all of the required BOP administrative forms is irrelevant to "proper exhaustion" if he failed to "compl[y] with [the BOP]'s deadlines and other critical procedural rules." Id.; see Macias, 495 F.3d at 44 ("Alerting the prison officials as to the nature of the wrong for which redress is sought, does not constitute 'proper exhaustion' under Woodford.") (internal citations, modifications, and quotation marks omitted). Here, because plaintiff's submissions were all denied on timeliness grounds and the BOP did not "address[] the issues on the merits," plaintiff failed to "properly" exhaust his administrative remedies. Woodford, 548 U.S. at 91.

Exhaustion under the PLRA, however, is not jurisdictional, but rather, an affirmative defense. Giano v. Goord, 380 F.3d 670, 675 (2d Cir. 2004). So, "while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply." Id. at 677 (quoting Porter, 534 U.S. at 524). The Second Circuit has recognized three "caveats" when timely exhaustion may be excused:

> [W]hen (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such [a] way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

Ruggiero v. Cnty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citing Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004)). When a genuine issue of material fact exists as to whether plaintiff "should be excused from exhausting his administrative remedies," judgment as a matter

of law is inappropriate.[6] Enigwe v. Zenk, No. 03-CV-854 (CBA), 2006 WL 2654985, at *4 (E.D.N.Y. Sept. 15, 2006) (Amon, J.); see Hill v. Curcione, 657 F.3d 116, 124 (2d Cir. 2011) (characterizing satisfaction of "the exhaustion requirement of the PLRA" as "a genuine issue of material fact").

Reading the evidence in the light most favorable to plaintiff, the Court finds that plaintiff "should be excused" from proper exhaustion under the PLRA. Enigwe, 2006 WL 2654985 at *4. Plaintiff claims that he timely turned in a BP-8 form the day after the incident, but never received any response from the MDC. See Abney v. McGinnis, 380 F.3d 663, 667 (2d Cir. 2004) ("[E]xhaustion may be achieved in situations where prison officials fail to timely advance the inmate's grievance"). With the twenty-day deadline for filing his BP-9 form fast approaching, plaintiff submitted two BP-9 forms detailing two separate claims. The Coordinator's response to plaintiff's BP-9 form was contradictory and confusing. While rejecting plaintiff's BP-9 form for one of two reasons (failure to attempt informal resolution via a BP-8 form *or* failure to prove plaintiff had filed a BP-8 form), the Coordinator nonetheless stated that "because of the seriousness of [plaintiff's] allegations[,] this complaint has been forwarded for review & investigation." At the very least, the Coordinator's response was susceptible to reasonable misinterpretation and confusion. See Snider v. Melindez, 199 F.3d 108, 114 n.3 (2d Cir. 1999) (finding administrative remedies unavailable where "the form on which [plaintiff] submitted his complaint present[ed] numerous possibilities for error" and "invit[ed] confusion"); Giano, 380 F.3d 678 (excepting improper exhaustion where plaintiff's "failure to do so was justified by his reasonable," but mistaken interpretation of BOP processes). Nonetheless, on the advice of his

---

[6] Because "the PLRA's exhaustion requirement is . . . not a jurisdictional prerequisite, dismissing an inmate's action for lack of subject matter jurisdiction . . . would be inappropriate." Arnold v. Goetz, 245 F. Supp. 2d 527, 534 (S.D.N.Y. 2003) (Knapp, J.). The Court, therefore, imports the legal standard for summary judgment to decide the issue. See infra Part II(B) for an explanation of the Court's decision to convert defendants' Rule 12(b)(6) motion into a Motion for Summary Judgment and the legal standard for summary judgment.

counselor, plaintiff submitted a new BP-8 form on August 4, 2009 along with his previously-submitted BP-9 form and again, plaintiff's claim was rejected for failure to pursue informal remedies.

Plaintiff's BP-9 rejection letter gave him five days to respond, but the following day he was transferred to UCP Canaan and his legal papers were confiscated for over a month. One month later, undeterred and back in possession of his legal documentation, plaintiff then filed an amended and much more thorough BP-9, detailing his claimed efforts at informal resolution and explaining his difficulty in retrieving his legal papers, despite requesting them, during and after transition between facilities. Cf. Hill v. U.S. Attorney's Office, E.D.N.Y., No. 08-CV-1045 (JS)(AKT), 2009 WL 2524914, at *5 (E.D.N.Y. Aug. 14, 2009) (Seybert, J.) (prisoner not excused from failure to exhaust where he had ten days *prior to transfer* to file a timely grievance); Nkansah v. Med. Dept. of MCC, No. 10 CV 3211, 2011 WL 4073362, at *5 (E.D.N.Y. Sept. 13, 2011) (finding plaintiff's transfer *three weeks after he received* response to his BP-8 form did not excuse failure to properly exhaust). Although plaintiff's latest submission and his subsequent appeals may have *technically* been available, these steps turned out to be mere empty gestures leading to preordained rejection for administrative mistakes plaintiff insists he never made. Of course, the record is susceptible to much less favorable inferences, but the Court must not draw them at this stage. Whether viewed through the lens of "availability," "estoppel," "special circumstances," or some combination of all three "caveats," liberally and generously read, the record reveals that plaintiff attempted to do that which he thought was required of him despite defendant-erected obstacles to proper exhaustion.

The Court, therefore, addresses the merits of plaintiff's Bivens claims.

### 3. FTCA Exhaustion

Exhaustion under the FTCA is separate and distinct from exhaustion under the PLRA. The FTCA's exhaustion requirements—unlike those under the PLRA—*are* jurisdictional. Celestine v. Mt. Vernon Neighborhood Health Ctr., 403 F.3d 76, 82 (2d Cir. 2005). Accordingly, "[a]lthough less burdensome than those required by the PLRA for Bivens claims, the [FTCA exhaustion] procedures . . . must be adhered to strictly, and failure to comply will result in dismissal of the complaint." Connors v. Heywright, No. 02 Civ. 9988(DC), 2003 WL 21087886, at *4 (S.D.N.Y. May 12, 2003) (Chin, J.) (internal citations and quotation marks omitted).

Defendants argue that plaintiff "did not satisfy the administrative tort claim exhaustion requirements of the FTCA *prior to suit*," and thus "cannot avail himself of the FTCA's wavier of sovereign immunity." Defs.' Mem. at 7 (emphasis added). Defendants do not challenge plaintiff's *substantive* exhaustion of his FTCA administrative tort claims, and rightfully so. Indeed, plaintiff properly presented an FTCA claim to BOP Regional on August 30, 2010 using a Standard 95 form, which sufficiently specified plaintiff's injuries, the location, the alleged culprits, the relevant circumstances, and a "sum certain" for $250,000 in damages, and on September 29, 2010, the regional office rejected plaintiff's claim. Defs.' R. 56.1 ¶¶ 78-79; see 28 U.S.C § 2675(a) (requiring plaintiff first to present his FTCA "claim to the appropriate federal agency" then receive final denial "by the agency in writing."); 28 C.F.R. § 14.2(a) (setting forth administrative presentment requirements under FTCA).

Instead, defendants argue that plaintiff violated the FTCA's time requirements by presenting his claim to BOP regional and receiving final denial of his tort claim five and six months, respectively, *after* he filed suit in this Court in March 2010. Under the FTCA, a plaintiff must present his tort claims to the appropriate federal agency within two years of the claims'

accrual, and a plaintiff must then file his or her action in federal court "within six months" after the claims have been "final[ly] denied" by the federal agency. 28 U.S.C. § 2401(b). Only after a plaintiff's FTCA claims have been properly exhausted—presentment through final denial—may a plaintiff file his claim in federal court. McNeil v. United States, 508 U.S. 106, 113 (1993). Failure to comply with the FTCA statute of limitations results in a "tort claim against the United States" being "forever barred." 28 U.S.C. § 2401(b).

Defendants overlook, however, that after plaintiff properly exhausted his administrative tort remedies on September 29, 2010, his complaint was amended to add the United States as a defendant to plaintiff's FTCA claims. This amendment confers subject matter jurisdiction to adjudicate plaintiff's FTCA claims against the United States.[7] While it is settled law that "the subsequent denial of an administrative claim cannot cure a prematurely filed action," Grancio v. De Vecchio, 572 F. Supp. 2d 299, 310 (E.D.N.Y. 2008) (Block, J.) (citing McNeil, 508 U.S. at 111), plaintiff's original March 2010 complaint neither named the United States as a defendant nor affirmatively asserted any FTCA claims. In January 2011, when Magistrate Judge Bloom amended plaintiff's complaint to include claims against the United States with no opposition by the government then or thereafter, the FTCA exhaustion requirements then attached. See

---

[7] Defendants previously acknowledged in correspondence with Magistrate Judge Bloom that amendment would confer subject matter jurisdiction over plaintiff's FTCA claim. See ECF Docket # 25 (informing Magistrate Judge Bloom that "[p]laintiff's FTCA administrative claim was denied on September 29, 2010," and conceding that "Plaintiff may now establish subject matter jurisdiction as to his FTCA case by refilling his Complaint at any time within six months after September 29, 2010, to wit, no later than March 29, 2011."). Sensitive to the fact that plaintiff's "prison trust fund account" had already been charged the mandatory PLRA filing fee and given the government's explicit concession that plaintiff could now properly sue the United States under the FTCA in federal court, the magistrate judge "deem[ed] plaintiff's complaint amended to include a claim against the United States under the FTCA." ECF Docket # 26. The United States had the opportunity to challenge this determination, see Fed. R. Civ. P. 72(a) ("A party may serve and file objections to the [magistrate judge's] order within 14 days after being served a copy"), but declined to do so. Any challenge to the magistrate judge's ability to amend would have been fruitless in any event as magistrate judges have the power to "hear and determine any pretrial matter pending before the court," 28 U.S.C. § 636(b)(1)(A), as long as that "pretrial matter [is] not dispositive of a party's claim or defense." Fed. R. Civ. P. 72(a); see also 28 U.S.C. § 636(b)(1)(A) (listing dispositive matters and motions that are exceptions to magistrate judge's broad authority to decide pretrial matters). The Court now sees no reason to disturb the magistrate judge's decision.

Grancio, 572 F. Supp. 2d at 310 (holding that where "initial complaint did not name the United States as a defendant or expressly assert claims under the FTCA," it "did not contain any claims subject to the [FTCA exhaustion] requirement and its filing [wa]s of no consequence to the exhaustion issue."). By that time, plaintiff had properly exhausted his FTCA claims. The Court, therefore, retains subject matter jurisdiction over plaintiff's common law tort claims against the United States. Defendants' Rule 12(b)(1) motion is denied.

B. The Merits

Although defendants filed a motion to dismiss, the Court may convert the motion to one for summary judgment as long as there is "sufficient notice to [the] opposing party and an opportunity for that party to respond." Groden v. Random House, Inc., 61 F.3d 1045, 1052 (2d Cir. 1995). Plaintiff does not dispute that he was given proper notice and in fact, took the opportunity to respond to defendants' motion by filing thirteen attachments and an opposition brief. Therefore, the Court considers defendants' motion as a motion for summary judgment pursuant to Rule 56.

Summary judgment "is warranted when, after construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, there is no genuine issue as to any material fact." Sledge v. Kooi, 564 F.3d 105, 108 (2d Cir. 2009) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50, 255 (1986)). The party opposing summary judgment must set forth evidence demonstrating a genuine issue for trial, and may not rely only on allegations in its pleadings. Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006). When, as here, a litigant is proceeding pro se, the Court must "read his supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). Nonetheless, "conclusory statements, conjecture, or

speculation by the party resisting the motion will not defeat summary judgment." Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996).

### 1. Bivens Claims

#### a. Inadequate Prison Conditions

Although plaintiff has a right to safe, nutritional food in detention, his Eighth Amendment claim fails because he does not raise genuine fact issues showing defendants were responsible for the alleged glass found in his food. See O'Keefe v. Goord, 77 F. App'x 42, 44 (2d Cir. 2003) ("[T]he Eighth Amendment requires that prisoners be provided with 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and wellbeing of the inmates who consume it.'") (quoting Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983)).

The Court agrees with defendants that plaintiff has failed to raise a genuine issue of material fact supporting his allegation that "defendants had any personal and direct involvement in preparing the plaintiff's meal" or "knowledge of any circumstances" that would suggest that plaintiff's food might be contaminated with glass. Defs.' Mem. at 21; see Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) (under Bivens, a plaintiff must "plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Nothing in the record suggests that Tonani, Rosa, Dr. Borecky, or Spears "personally put glass in plaintiff's food or had any reason to know that his food was contaminated when it was served." Gray v. Metro. Det. Ctr., No. 09-CV-4520(KAM)(LB), 2011 WL 2847430, at *10 (E.D.N.Y. July 15, 2011) (Matsumoto, J.). Neither does plaintiff allege that Food Administrator Elraheb was responsible for personally handling plaintiff's food on that day or any other.

More importantly, plaintiff cannot show that the defendants acted with "deliberate indifference." Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). Plaintiff raises no fact issue that supports the inference that defendants knew or should have known of the risk that glass could end up in inmate food. Prior to plaintiff's complaint on July 13, 2009, Elraheb had never received a complaint about glass in detainee food. Cf. Lunney v. Brureton, No. 04 Civ. 2438 LAK GWG, 2005 WL 121720, at *6 (S.D.N.Y. Jan. 21, 2005), adopted by 2005 WL 433285 (S.D.N.Y. Feb. 23, 2005) (Kaplan, J.) (allegations that "meals were regularly spoiled and/or improperly prepared on numerous occasions . . . support[ed] the inference that prison officials were aware of the risk to [plaintiff's] health and safety . . . but disregarded the excessive risk of harm"). Elraheb also testified that he was surprised by plaintiff's allegations since there was no glass kept in the MDC food services area. See O'Keefe, 77 F. App'x at 44 (dismissing complaint "[b]ecause [plaintiff] did not allege any knowledge on the part of [defendants] that the diet [plaintiff] was provided was inadequate").

Therefore, the Court grants summary judgment on plaintiff's Bivens action for inadequate prison conditions under the Eighth Amendment.

### b. Medical Indifference

Plaintiff also brings a Bivens action under the Eighth Amendment for defendants' alleged indifference to his need for medical care. See Salahuddin, 467 F.3d at 279; Estelle v. Gamble, 429 U.S. 97, 104 (1976). Plaintiff must show defendants acted with "[d]eliberate indifference to [his] serious medical needs" by pointing to prison doctors' inadequate care, denial or delay of access to medical care, or prison guards' interference with prescribed treatment. Id. at 104-05. To show medical indifference, "[s]ubjectively, the official charged . . . must act with a

18

sufficiently culpable state of mind" and objectively, "the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." Hill, 657 F.3d at 122 (2d Cir. 2011) (internal quotation marks omitted). The Court need not reach the subjective element, because plaintiff fails to raise a genuine issue of material fact with regard to the objective element.

The Second Circuit has clarified that a prisoner must be "*actually deprived* of adequate medical care" to state a medical indifference claim. Salahuddin, 467 F.3d at 279 (emphasis added). Because plaintiff has failed to raise a fact issue showing that the care provided by BOP officials was inadequate, either because of delay or quality of care, plaintiff's Eighth Amendment medical indifference claim fails.

"[N]ot every lapse in medical care is a constitutional wrong." Id. "Although a *delay* in providing necessary medical care may in some cases constitute deliberate indifference, this [Circuit] has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast-degenerating condition for three days; or delayed major surgery for over two years." Demata v. New York State Corr. Dept. of Health Servs., 198 F.3d 233, 1999 WL 753142, at *2 (2d Cir. Sept. 17, 1999) (Table) (internal citations and quotation marks omitted) (emphasis added). Plaintiff alleges no delay that would rise to these levels.

Plaintiff does not dispute that within approximately thirty minutes of his alleged ingestion of glass, Nunez examined him and the following morning he saw a second PA, Rosa. Even though Rosa determined that plaintiff did not seriously need medical attention, she arranged to have plaintiff taken to a doctor. Within twenty-four hours, plaintiff saw Dr. Borecky, who conducted a full exam, ordered an X-ray, and confirmed Nunez's and Rosa's observations that

plaintiff was not suffering from any serious condition. In total, three health practitioners saw plaintiff within two days of the incident, undermining his argument that defendants delayed his medical care. See, e.g., Clay v. Kellmurray, 465 F. App'x 46, 47 (2d Cir. 2012) (no deliberate indifference where plaintiff denied thyroid medication for three days); Alster v. Goord, 745 F. Supp. 2d 317, 335 (S.D.N.Y. 2010) (Pauley, J.) (no Eighth Amendment violation where prison waited two days after plaintiff complained of abdominal pain to take him to hospital and later failed to transport him to appointments).

Neither does plaintiff raise any fact issue suggesting that he received poor quality, let alone constitutionally infirm, care. Over the next few months, plaintiff was seen nearly a dozen times by BOP health professionals, prescribed medication as needed, and provided an additional X-ray. Only *twice* during this period did plaintiff complain of gastrointestinal or rectal symptoms, and on neither of these occasions did plaintiff's medical professional diagnose a condition consistent with having consumed glass. See Gowins v. Greiner, No. 01 Civ. 6933(GEL), 2003 WL 943239, at *2 (S.D.N.Y. Mar. 10, 2003) (Lynch, J.) (finding that "factual record demonstrates conclusively that defendants did not show indifference to [plaintiff's] various ailments" where defendants "provided him with treatment . . . did not ignore the injuries of which [plaintiff] complain[ed] . . . diagnosed [plaintiff] . . . continued to review the chart, [and] follow the progress of the injury . . . .").

Because plaintiff has failed to raise a fact issue showing he was "actually deprived of adequate medical care," Salahuddin, 467 F.2d at 279, summary judgment is granted on this claim.

20

## 2. FTCA Claims

Ford also alleges state tort claims for medical malpractice and negligence under the FTCA. As the alleged acts and omissions all occurred in New York, New York law applies. 28 U.S.C. § 1346(b)(1) (United States is "liable to the claimant in accordance with the law of the place where the act or omission occurred.").

To establish medical malpractice, "a plaintiff must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries." Arkin v. Gittleson, 32 F.3d 658, 664 (2d Cir. 1994). The general standard of care in New York holds a physician "'liable for an injury . . . resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment.'" K.R. ex rel. Perez v. United States, 843 F. Supp. 2d 343, 355 (E.D.N.Y. 2012) (Kuntz, J.) (quoting Pike v. Honsinger, 155 N.Y. 201, 209 (N.Y. 1898)). Only health care professionals—in plaintiff's case, Dr. Borecky, Nunez and Rosa—can be liable for medical malpractice. Savarese v. Allstate Ins. Co., 731 N.Y.S.2d 226, 227 (N.Y. App. Div. 2001) ("No action to recover damages for medical malpractice arises absent a physician-patient relationship.").

Plaintiff has failed to raise a genuine issue of material fact that Dr. Borecky or the physician's assistants breached New York's standard of care or that any of their acts or omissions injured plaintiff. As discussed previously, plaintiff was promptly seen, examined, tested, medicated, and cleared for any internal injuries that might have resulted from ingesting glass. Plaintiff was subsequently seen ten times over the course of the next nine months, and plaintiff again received prompt and thorough treatment. The Court grants summary judgment on plaintiff's medical malpractice claim.

Plaintiff's second FTCA claim—for negligence—also fails because plaintiff cannot show that any conduct by defendants caused him injury. A negligence claim requires proof that "(1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, and (3) that breach caused the plaintiff's injuries." Bacon v. United States, 104 F. App'x 208, 209 (2d Cir. 2004) (citing Akins v. Glen Falls City Sch. Dist., 53 N.Y.2d 325, 333 (N.Y. 1981)).

Although "courts have been hesitant to resolve negligence actions at the summary judgment stage," Ford has proffered *no* evidence to rebut defendants' comprehensive and contemporaneous medical records demonstrating that plaintiff was not actually injured as a result of their actions. Kennedy v. Syracuse Univ., No. 94-CV-269 (FJS) (GJD), 1995 WL 548710, at *3 (N.D.N.Y. Sept. 12, 1995) (Scullin, J.) (granting summary judgment where plaintiff "failed to refute" defendant's medical opinion on issue of causation). The evidence overwhelmingly demonstrates that even if plaintiff did actually consume glass or some other foreign object, he fortunately escaped injury as a result, serious or otherwise. This conclusion finds further support from the months-long absence—subsequent to the initial observations and examinations of plaintiff—of any complaints of pain or symptoms that arguably could have resulted from the ingestion of glass, aside from what turned out to be unrelated gastrointestinal issues, or requests for the renewal of the pain medication prescribed initially by Dr. Borecky. Instead, plaintiff "merely relies upon his own conclusion" that he was injured as a result of defendants' action or inaction, which is insufficient to survive summary judgment. Kennedy, 1995 WL 548710 at *2; see, e.g., Shields v. U.S. Fed. Bureau of Prisons, No. 8:08-CV-632 (NAM/DEP), 2010 WL 2803399, at *8-*9 (N.D.N.Y. July 15, 2010) (Mordue, J.), aff'd 446 F. App'x 325 (2d Cir. 2011) (granting summary judgment where plaintiff failed to cast "doubt on the propriety of defendant's

evaluation, diagnosis, or treatment[s]," despite complaints of "unremitting burning sensations[,] dizziness, and discomfort").

Because "plaintiff's allegations fail to meet [his] 'burden of coming forward with evidence directed to specific facts showing that there is a genuine issue for trial,'" <u>Montessi v. Am. Airlines, Inc.</u>, 935 F. Supp. 482, 487 (S.D.N.Y. 1996) (Motley, J.) (quoting <u>West-Fair Elec. Contractors v. Aetna Casualty & Surety Co.</u>, 78 F.3d 61, 63 (2d Cir. 1996)), the Court grants summary judgment on plaintiff's negligence claim.

## III. CONCLUSION

For the foregoing reasons, plaintiff's constitutional claims against the United States and the federal employee defendants in their official capacities are dismissed under Rule 12(b)(1). Plaintiff's state tort claims against the federal employees in their individual and official capacities are also dismissed under Rule 12(b)(1). All claims against Nunez are dismissed under 42 U.S.C. § 233(a) and Rule 12(b)(1). Defendants' motions to dismiss plaintiff's FTCA and <u>Bivens</u> actions for failure to exhaust are denied. Defendants' motion for summary judgment is granted, however, as to plaintiff's <u>Bivens</u> claims against the federal employees in their individual capacities, as well as plaintiff's FTCA claims against the United States.

SO ORDERED.

Dated: Brooklyn, New York
      September 27 2012

s/RJD

RAYMOND J. DEARIE
United States District Judge